# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| **OMAR ABDULLAH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:12 CV 54** |
| | ) | **No. 3:12 CV 169** |
| **F AND F MACHINE SPECIALTIES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## O R D E R

In this consolidated action plaintiff Omar Abdullah ("Abdullah") alleges racial discrimination in employment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Abdullah, who is black, alleges that he was laid off while other white employees with less seniority, experience, and worse attendance records were not; and then, as further racial discrimination and as retaliation for him having filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), white employees with less seniority were called back while he was not. After a lengthy series of discovery disputes, defendant F and F Machine Specialties (hereinafter, "F&F") moved for summary judgment on plaintiff's claims. (DE # 165.) Plaintiff has filed a response, amended that response twice (DE ## 178-180), and defendant has filed a reply. (DE # 183.) For the following reasons, F&F's motion is granted.

## I.    Facts and Procedural History

The following facts are taken primarily from F&F's statement of material facts. (DE # 167.) Although Abdullah has filed a response (DE # 177), it does not contain a Statement of Genuine Disputes as is required by Local Rule 56-1. It does, however, explain which of F&F's proposed undisputed facts he agrees and disagrees with, but without citing to evidence of record to support the disputes. Instead, his response (which is not in the form of an affidavit) summarizes reasons why Abdullah disagrees with some facts claimed by F&F. (For example, plaintiff disputes that early negative performance reviews were accurate, but explains he never spoke up to correct them because he was new on the job. (DE # 177 at 1, ¶ 13.))

In addition, Abdullah has filed supplemental responses which do attach materials produced in discovery attempting to support his arguments, but that support consists largely of handwritten annotations on/attached to the documents disputing their content; or arguing that defendant failed to produce discovery that would have contradicted them and supported plaintiff's assertions showing (in plaintiff's opinion) that F&F is misrepresenting the facts.[1]

---

[1] Of many possible examples, the court provides two. First, after attaching a job description, attendance record, and a performance evaluation, plaintiff writes: "Defendant has constantly claimed Plaintiff had a limited skill set yet failed to give Plaintiff the documents to show all the different departments that Plaintiff has successfully worked in . . . and refuse[d] to identify Plaintiff[']s skill set." (DE #179 at 28.) Second, responding to F&F's statement that Abdullah tuned down training on "[sand] blasting" machines, Abdullah writes that he "was very well trained in running the blasting machines & has ran them plenty of times even coming in to run them on overtime that is why Defendant wouldn't supply Plaintiff with documentation to prove

Simply put, what plaintiff has done does not properly place in dispute the facts F&F put forth. Nevertheless, plaintiff is proceeding pro se, and the court has taken into consideration his response to the extent it is properly supported and relevant, noting where that is the case. However, F&F did give Abdullah the required notice of his need to file a properly-supported response to its summary judgment motion, *Timms v. Frank*, 953 F.2d 281, 285 (7th Cir. 1992) (DE #164), and although filings by parties proceeding pro se are entitled to liberal treatment, those parties must still comply with the procedural rules. *McNeil v. United States,* 508 U.S. 106, 113 (1993). Thus, while the court has reviewed Abdullah's filings and used them to provide additional context for the arguments made by F&F and to look for discrepancies in the facts it claims are not in dispute, the facts as claimed by F& F are almost entirely accepted as the undisputed facts in this case.[2]

F&F manufactures parts for the medical industry. It hired Abdullah in 2007 and he worked there until April 2011, in the position of Utility Operator. (Ex. A, Ex. B.)[3] Abdullah's primary responsibility as a utility employee was operating a saw. (Ex. D.)

_____

that fact." (DE # 180 at 3.)

[2] Abdullah also requested that the court read all portions of his deposition provided by F&F in support of its motion. Although it was not required to do so, because judges "are not like pigs, hunting for truffles" in the record, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), the court has read it, and cites additional facts herein when they might be helpful to Abdullah.

[3] All exhibits cited are to F&F's appendix in support of its motion for summary judgment at DE #169.

Although Abdullah originally applied for a machinist position at F&F, he was hired as a utility employee because he was not qualified to do "setups," that is, he could only run the saw (and other machines) after they were prepared for operations. (Ex. C at 72:19-25; Ex. D.) Abdullah disputes that his primary responsibility was operating the saw,[4] stating that his primary responsibility was operating the saw and being a driver. (DE # 177 at 1.) As F&F also states that Abdullah's secondary responsibilities included loading and unloading materials and making deliveries (i.e., being a driver as Abdullah describes his duties), along with other manual labor tasks as needed (Ex. E, Ex. D), this dispute is not material. At all times, Abdullah was an "at will" employee. (Ex. F.)

Throughout his employment with F&F, Abdullah reported to supervisor Nick Borton, who reported to vice president Randy Bender, who reported to president David Behrens. (Ex. C at 85:23-86:2). F&F's standard performance evaluations for employees in positions such as Abdullah include seven categories: Quality, Performance, Safety & Housekeeping, Documentation, Initiative, Tools for Trade, and Independence. (Ex. H.) In his first performance evaluation in late 2007, Abdullah was rated "below average" in two categories: Performance and Documentation. (Ex. H.) The evaluation was administered by Abdullah's direct supervisor, Nick Borton, and contained several specific and objective critical comments (*e.g.*, "need[s] to double check part counts and lengths more frequently") (*Id.*), as did all performance reviews which followed. (Ex. I,

---

[4] The fact is not truly disputed because Abdullah's statement is not in an affidavit. If any facts are properly disputed the court will make that clear in the text.

Ex. L ("too much scrap"), Ex. M.) Based on the introductory performance evaluation, Abdullah received an overall rating of "average" and did not receive a raise. (*Id.*)

Abdullah's performance declined in 2008. (Ex. I.) In his 2008 evaluation, Abdullah's performance was below average in four of the seven categories: Quality, Performance, Safety & Housekeeping, and Documentation. (*Id.*) Abdullah's 2008 evaluation gave him notice that "his performance and quality will have to improve if he is to maintain his employment." (*Id.*) His overall evaluation was below average and he was not entitled to a pay raise. (*Id.*) Abdullah attempts to place the foregoing in dispute by arguing that in his opinion, the evaluation was incorrect and unfair (for example, he argues that other employees handing materials after him sometimes ruined them, then blamed him for cutting them wrong), and that he complained about it to President David Behrens. F&F admits that he did complain to Behrens and he was then granted a 5% pay increase to $10.50/hour. (Ex. J.)[5] In his deposition Abdullah testified that he decided to deal directly with Behrens because he never trusted his supervisor, Borton, because Borton had a large tattoo of a noose on his arm. (Ex. C at 89:1-7.)[6]

On August 7, 2009, Defendant gave Abdullah a written warning for failing to follow standard operating procedure by not getting prior approval before beginning

---

[5] F&F states that the increase was contingent upon improved performance, and Abdullah argues that is untrue. The exhibit F&F cites (Ex. J) does not mention any contingency.

[6] In its reply memorandum, F&F denies that Borton has such a tattoo, and states there is no evidence in the record that he does. Abdullah's cited deposition testimony provides evidence of the tattoo.

production on a job. (Ex. K.) The written warning stated, "it's been noticed that parts are coming from saw undersized and the part counts [are] off. Omar must check his quality and quantity for every job." (*Id.*) The warning specified that "if this happens again termination could follow." (*Id.*) Abdullah acknowledged the warning by signing it. (*Id.*)[7]

Abdullah's performance continued to decline, and his performance evaluation rating was below average for the second year in a row. (Ex. L.) In his end-of-year performance evaluation, he was below average in five of the seven categories: Quality, Safety & Housekeeping, Documentation, Initiative, and Independence. (*Id.*) F&F contends that Abdullah did not receive a pay increase due to his poor performance in 2009, but after complaining to Behrens that he had received only one raise in two years, he received another small raise. The exhibit cited, Ex. J, does not bear this out, and Abdullah denies that he complained he had received only one raise in two years, but he admits that he received another $.50/hour raise after complaining to Behrens that the performance review was not accurate. (DE # 177 at 3.)

In 2010, Abdullah again was rated below average in five categories: Quality, Safety & Housekeeping, Documentation, Initiative, and Independence. (Ex. M.)  His overall rating was again below average. (*Id.*) Although no pay increase was warranted

---

[7] Abdullah argues that F&F failed to follow its progressive discipline policy by not first giving him a verbal warning, but he has failed to provide evidence of that policy. The court finds it in F&F's Ex. V at 43, and it states that F&F "may use progressive discipline at its discretion." (DE # 169-22 at 43.)

based on that rating, Abdullah again complained to Behrens, and on November 15, 2010, he was given a written statement of improvements he must make in order to receive a $.55/hour raise based on re-evaluation in 60 days. (Ex. N.) Although Abdullah argues that he told Behrens at this time that he believed that Borton had been giving him poor evaluations on account of his race (DE # 177 at 3-4), he has provided no evidentiary documentation of having told Behrens that, and in his deposition he testified that everybody, including white employees, was receiving bad performance reviews:

> A. Everybody got bad evaluations.
> Q. Okay. How did you know what other people got on their evaluations?
> A. Because everybody – it was a known fact. They were called "de-valuations" –
> Q. Okay.
> A. – you know.
> Q. You say "everybody." Does that include white employees and black employees?
> A. White employees. Yeah, they were called "de-evaluations."
> Q. So everyone felt that they didn't get good evaluations?
> A. Yeah. Yeah. I never heard of anybody getting a good evaluation.

(Ex. C at 82:5-20).

In their affidavits, Behrens, Bender and Borton all state that during his employment at F&F, Abdullah was offered opportunities to train as a machinist or finisher, to allow him to advance from his utility operator position. (Ex. D, Ex. G, Ex. O.)[8] In his deposition Abdullah denied he had ever been offered such training (Ex. C at

---

[8] F&F has also offered emails (Ex. P) memorializing conversations claimed to occurred in or around 2009 with Abdullah in which he declined the training opportunities. The emails are dated in 2012, after Abdullah filed his charge of

73:4-3; 110: 20-24), but also stated that he never asked for training as a machinist and didn't want the position because he was "fine where [he] was at." (Id. at 73:14-23.)

In late 2010, F&F bought a new automatic saw which significantly reduced the time F&F needed for Abdullah to operate it. (Ex. D at ¶8.) The saw did not require its operator to have any special skills. (Ex. D at ¶9.) Although Abdullah argues that his *duties* on the new saw and the old saw were the same (DE # 177 at 9), he does not properly dispute the fact that less of his time was needed to operate it; moreover, that is consistent with his arguments that he had become more of a driver, picking up and dropping off parts around town, than a saw operator. (*Id.* at 5 ("pickup & delivery duties had [him] punching out as late as 9 pm").)

A few months later, in early April, 2011, F&F's largest customer told F&F that it would be significantly reducing the volume of its orders. (Ex. D at ¶10.) This loss of business substantially reduced F&F's overall staffing needs, resulting in a decision to terminate several employees. (*Id.* at ¶¶ 10-11). Behrens, who was personally familiar with each employee's work, decided who to terminate based solely on performance and skills; he did not factor in seniority or attendance in deciding which employees to retain. (*Id.* at ¶ 12.) As a courtesy, F&F characterized the terminations as lay-offs to ensure the employees would be eligible for unemployment benefits, (*Id.* at ¶ 13), although the lay-off notice (Ex. R) did not give a call-back date. At the time, F&F had 50 employees, and

_____

discrimination, and he argues they are fabrications. The court has not given them any weight.

seven were terminated, including Abdullah. (Ex. D at ¶ 14-15.) The other six employees

terminated were white. (*Id.* at ¶ 15.) There was only one other black employee at F&F,

and he was not terminated. (*Id.* at ¶ 23.)

The six white employees were all terminated a few days before Abdullah, and

for the following reasons:

- Jack Parks, a part-time employee who handled the tool crib, was no longer
needed because F&F went to an automated vendor-managed tooling system;

- Jeff Bridges, a welder, because only one welder was needed and there was
another welder who had more skills;

- Jeff Wiley, a wire machine operator, had received a below average performance
review and only one wire machine operator was needed;

- Josh Beers, a utility worker, had the lowest skill level among the four employees
in his department;

- Joe Eggleston, a machinist, had below-average performance reviews;

- Jason Koonz, a machinist, had below-average performance reviews.

(*Id.* at ¶¶ 16-21.) Like Abdullah, these six employees all reported directly to Borton. (Ex.

O at ¶ 7.)

F&F did not fill Abdullah's position. (Ex. D at ¶ 25.) The automatic saw eliminated the need for any saw-specific skills,[9] and Abdullah's secondary responsibilities were divided among other employees. (*Id.*)

Abdullah filed his EEOC discrimination charge on October 21, 2011 (Ex. A), after learning that F&F had called some of the other employees back to work. (Ex. C at 181:19 - 182:8.) One employee was permanently rehired, three were temporarily rehired, and three, including Abdullah, Jeff Bridges, and Jeff Wiley, were never called back or rehired. (*Id.* at 182:7-184:19). Abdullah was not contacted and offered a position because his skills were not needed and primarily because of his prior negative performance reviews. (Ex. D at ¶ 26.) His former position was eliminated never filled after the terminations. (*Id.* at ¶25.) That was also true for Wiley's position. (Ex. U.) Bridges' position was not filled for a year and a half, until September 2012, when F&F hired a new welder. (*Id.*)

In his deposition, Abdullah testified that he was never racially harassed while employed at F&F.[10] (Ex. C at 87:25). When asked who at F&F discriminated against him,

---

[9] As noted above, Abdullah argues that running the new skill involved the same duties, and that a second-shift employee who spent the majority of his time operating the saw. (DE # 177 at 9.) Again, this is not properly-supported evidence. In addition, Abdullah does not explain what other skills that employee may have had, and this does not place in dispute the evidence that F&F didn't need Abdullah's skills to the degree it had before.

[10] However, he also stated that Borton had described a home repair as "Afro-rigged" which Abdullah understood to be a euphemism for the epithet "nigger-rigged," meaning a sloppy repair. (Ex. C at 147:24 - 148:9.) He also perceived other references to his race as discriminatory because unnecessary. (*Id.* at 146:21 - 147:7.)

he described it as a "conspiracy" among Borton, Bender, and Behrens (*Id.* at 140:17 - 141:14.) Borton was responsible for the bad performance reviews, and "the noose tattoo tells you everything." (*Id.* at 140:20.) Abdullah theorized that Bender may have resented Abdullah because Bender's son was also an F&F employee and was being paid less than Abdullah. (*Id.* at 140:22 - 141:4.) As to Behrens, Abdullah "can't say he's a racist or doesn't like black people, but I don't think he likes the fact that I stood up to him and [did] not even show intimidation."  (*Id.* at 141:7-10.)

On October 17, 2011, Abdullah filed a charge of discrimination based on race with the EEOC. (Ex. A.) After filing this lawsuit, Abdullah filed a second charge with the EEOC (Ex. T), because he felt that he was never called back as retaliation for having "filed discrimination" (presumably, both the EEOC charge and the lawsuit). (Ex. C at 174:4-22.) In the second EEOC charge Abdullah alleged that he was discriminated against on the basis of race and checked the box on the form for "race" discrimination, but he did not check the box for "retaliation." (Ex. A.) In his deposition he testified that doing so was a "mistake," although it is not clear whether he meant that his mistake was not checking the box for retaliation in the second charge, or not including a claim for retaliation in the complaint that initiated this action. (Ex. C at 177:14-25.) In any event, after the EEOC declined to pursue that charge Abdullah filed a second action claiming retaliation (3:12 CV 169) which has been consolidated herein.

F&F has moved for summary judgment on all of Abdullah's claims. (DE # 165.)

11

## II.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 requires the entry of a summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met and discharges that responsibility by showing that there is an absence of evidence to support the non-moving party's case. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex,* 477 U.S. at 323). To avoid a summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986)). The nonmoving party must show that

there is enough evidence to allow a reasonable jury to find for him/her under the appropriate ultimate burden of proof. *Id.*

The court's role in deciding a summary judgment motion is not to decide what is true in the case, but instead to determine whether there is disputed evidence on material issues creating the necessity for a trial. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). The court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts (the plaintiff receives the benefit of all reasonable inferences), these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). The court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

**III.    Analysis**

As a preface to the analysis which follows, F&F gave a concise one-paragraph summary of its argument for summary judgment, as follows:

> F and F Machine Specialties terminated Omar Abdullah's employment as part of a company-wide reduction of seven employees of its fifty employees. When he was selected for termination, Abdullah had a history of poor performance evaluations, and the company had recently purchased new equipment that made his skills less necessary and less

valuable. The termination was unrelated to his race, and Abdullah has no evidence to support his allegation that his termination was racially motivated. Abdullah was treated the same as his white comparators, and he was treated no less favorably than his comparators who did not file a charge of discrimination. Because there are no genuine issues of material fact related to Abdullah's claims of discrimination and retaliation, F&F is entitled to judgment as a matter of law. . . .

(DE #166 at 1.) (Abbreviations omitted.) In light of the foregoing, F&F urges that this is an appropriate case to abandon the "ossified" direct/indirect-proof approach to analyzing discrimination cases, and instead just view the evidence as a whole and apply the "simple analysis of whether a reasonable jury could infer prohibited discrimination." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013). Nevertheless, exercising prudence, F&F does structure its argument using the familiar direct/indirect method, and the court will do the same in its analysis, although in a quite abbreviated fashion given the paucity of evidence Abdullah has provided.

Under the "direct" method of proving a Title VII discrimination case, a plaintiff offers either direct or circumstantial evidence that essentially shows an acknowledgment of discriminatory intent by the defendant or its agents; that is, "smoking gun" type evidence, which is rare. *Id.*; *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Thus, plaintiffs more often use the "indirect" method, deploying the familiar burden-shifting framework in which a plaintiff who establishes a prima facie case enjoys a presumption of discrimination which requires the defendant to articulate a legitimate non-discriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under that indirect burden-shifting method, a plaintiff carries "the initial burden under the statute of establishing a prima facie case of . . . discrimination." *McDonnell Douglas Corp.,* 411 U.S. at 802 . To establish a prima facie case of discrimination, a plaintiff must offer evidence that: (1) he is a member of a protected class; (2) his job performance was meeting the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly-situated individuals not in the protected class were treated more favorably.[11] *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012). Once such a showing is made the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the employer does so, then the burden shifts back to the plaintiff to offer evidence suggesting that the offered explanation is a pretext for discrimination. *Id.*

*a. Lay-off/Termination Claim*

F& F argues that Abdullah has absolutely no evidence on the issue of discriminatory intent to make his case using the direct method. Taking a more charitable view of the evidence, liberally and in a light favorable to Abdullah, the best (indeed, only) direct evidence he has that the decision to select him for lay-off/termination resulted from racial discrimination is the fact that his direct supervisor,

---

[11] The prima facie case varies based on the factual circumstances, *McDonnell Douglas,* 411 U.S. at 802 n.13, and the fourth element is often inaccurately phrased. *See Pantoja v. American NTN Bearing Mfg. Corp.,* 495 F.3d 840, 845-46 (7th Cir. 2007). The treatment of similarly-situated employees is relevant to, and so the fourth element in, traditional reduction-in-force cases, *see, e.g., Bellaver v. Quanex Corp.,* 200 F.3d 485, 494 (7th Cir. 2000), and seems appropriate here.

Borton, had a tattoo of a noose, on one occasion used the offensive phrase "Afro-rigging," and sometimes remarked on Abdullah's race when there was no apparent reason to do so. In other words, Borton, who authored all of Abdullah's poor performance reviews, may have had a general prejudice against black people which had some influence on his opinion of Abdullah's work.

However, Abdullah concedes that Borton gave virtually all of his employees who were white poor performance reviews, so it is not all that clear that this is even a reasonable inference to draw.[12] More importantly, Abdullah has offered nothing to contradict Behrens' affidavit affirming that he was personally familiar with Abdullah's work and that he selected Abdullah for termination, and Abdullah admitted in his deposition that he does not think that Behrens is a racist or dislikes black people. Because Borton did not make the final decision and it appears his reviews did not influence Behrens (Behrens decided to give Abdullah pay raises despite those reviews),[13] the court concludes there is no triable issue of fact for a direct-method case.

_____

[12] As explained above, Borton cited objective problems with Abdullah's performance in each review, such as his scrap rate. Abdullah argues that some of these problems were caused by other employees who blamed them on him, but he does not show that Borton did not honestly believe Abdullah was at fault, and courts do not second-guess lousy (but not discriminatory) employment decisions, the oft-repeated square peg-round hole metaphor. *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989). Abdullah testified in his deposition that he thought Borton was a poor supervisor who dod things like fall asleep at his desk. (Ex. C at 139:23 - 140-:5.)

[13] Behrens stated that he selected Abdullah because he had a low skill level and below-average performance reviews, but he also stated that he was personally familiar with Abdullah's work, and that Abdullah's position was never filled because F&F no longer needed an employee with saw-specific skills. (Ex. D at ¶¶ 22, 12, 25.)

Under the indirect-method, F&F argues that Abdullah has no evidence to offer on the first or fourth elements of the prima facie case. As to the first element, F& F argues that Abdullah's poor performance reviews show that he was not meeting its legitimate expectations. Given that those performance reviews were written by Borton, whose opinion, as explained above, might be questioned on the basis of a general racial anumus, and that Behrens gave Abdullah pay increases despite the reviews, suggesting the opposite, the court will presume that Abdullah satisfies the second factor.

The fourth factor—whether similarly-situated employees not in the protected class were treated more favorably—is not so easily discounted, however. Along with Abdullah, six white employees were laid off/terminated, that is, 12% of F&F's workforce (14% overall when Abdullah is included). Only one of the white employees was ever permanently rehired. The court cannot see how there is any inference that employees outside the protected class were treated more favorably than Abdullah.[14] Thus, Abdullah does not show a triable issue based on an indirect prima facie case. Lacking such a showing, there is no need to continue the analysis and consider pretext. *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002) ("If a plaintiff is unable to establish a *prima facie* case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry"); *Coco v. Elmwood Care, Inc.*, 128

---

[14] Abdullah has not identified any non-black employees with skills and performance comparable to him who were not laid off.

F.3d 1177, 1179 (7th Cir. 1997) ("the prima facie case under *McDonnell Douglas* must be established and not merely incanted.")

Nevertheless, even if the court goes on to consider the issue of pretext—given how often all of the inquiries collapse, *Perez*, 731 F.3d at 703, and the fact that in F&F's 14% overall reduction-in-force, 50% of its black employees were chosen[15]—the court sees no evidence suggesting that Behrens' explanation for choosing Abdullah (and not recalling him) is pretextual. It is undisputed that F&F's suffered a major business downturn requiring it to reduce its workforce. It is undisputed that Behrens, whom Abdullah believes harbors no racial animus, chose the employees to lay off/terminate. It is undisputed that Behrens was personally familiar with Abdullah's work and thought he had a low skill level. I t is undisputed that Behrens believed that a person with saw-specific skills was no longer needed, and that all of Abdullah's additional duties were divided among other employees. The court sees no evidence from which it can be inferred that F&F's explanation is a pretext for discrimination.[16]

---

[15] This provides a quite weak inference, since it could also be said that F&F laid off 12/5% of its white employees while keeping 50% of its black employees.

[16] After the summary judgment motion was fully briefed, Abdullah filed two motions (DE # 184, # 185) in which he asked for a"pretext inquiry hearing." In both motions Abdullah sought to call witnesses to provide new factual information in response to defendant's motion. Abdullah could have obtained the information during a long and contentious discovery process, which was already closed. Therefore, the motions are denied.

*b. Retaliation Claim*

F&F asks the court to dismiss/grant summary judgment on Abdullah's retaliation claim because, as is undisputed, he did not check the box for "retaliation" when he filed his second EEOC charge. The "scope-of-the-charge" rule prohibits plaintiffs from bringing claims in federal court that were not included in their EEOC charge, because doing so frustrates the EEOC's role to investigate and settle claims, and deprives the charged party of notice. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47 (1974). However, claims which are "like or reasonably related to" the allegations in the charge and would be expected to grow out of the EEOC's investigation of the allegations in the charge are not beyond the scope, and may be litigated. *Vela v. Village of Sauk Village*, 218 F.3d 661, 664 (7th Cir. 2000); *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).

Here, in his second EEOC charge Abdullah stated that he had learned that several white employees, but not him, had been recalled (Ex. T), which is the conduct that is the basis of his retaliation claim (DE # 127). In addition, and F&F does address the claim's merits. The court will therefore rule on those merits.

The court notes, first, that in his response to F&F's motion, Abdullah provides nothing responsive to F&F's arguments. It is fair to conclude that Abdullah has abandoned his retaliation claim. *Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir.2003) (claim not addressed in response to summary judgment motion is deemed

abandoned); *Carragher v. Indiana Toll Rd. Concession Co.*, 936 F. Supp. 2d 981, 988 (N.D. Ind. 2013).

Second, assuming Abdullah would use the direct method to establish his claim, one element of it is showing a causal linkage between his protected action and the adverse action taken. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011) (listing elements). When Abdullah filed his first claim of discrimination, on October 17, 2011 (Ex. A), he already knew that F&F had rehired some of the laid-off employees. (Ex. C at 182:1-8). In short, because that rehiring occurred before he filed the EEOC charge, there can be no causal connection. Assuming that Abdullah would use the indirect method, the claim would fail for the reasons explained above:[17] mainly, Abdullah lacks any evidence to suggest that F&F's explanation as to why it did not call him back—that his position had been eliminated and his saw skills were no longer needed[18]—is a pretext for discrimination. Thus, viewed under either method, there is no triable issue of fact on Abdullah's retaliation claim.

_____

[17] Although proof of a causal connection is not an element of an indirect-method retaliation claim, it is difficult to see how the timing of the events—Abdullah claiming that employees recalled before he charged discrimination shows that he was being retaliated against—does not disprove the claim under any guise.

[18] The court notes that the "new hire spreadsheet" (Ex. U) provided by F&F does not show any new employees hired after Abdullah filed his EEOC charge solely as "utility operator," his former job description.

## IV.    Conclusion

For the foregoing reasons, plaintiff Abdullah's motions for a "pretext inquiry hearing" (DE # 184, # 185) are both **DENIED**, and defendant F&F's motion for summary judgment (DE # 165) is **GRANTED**. There being no claims remaining against defendant in this case, the clerk is directed to **ENTER FINAL JUDGMENT** as follows:

> Judgment is entered in favor of defendant F and F Machine Specialties, and against plaintiff Omar Abdullah, who shall take nothing by way of his complaint.

**SO ORDERED.**

Date: March 31, 2016

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT